Filed 1/7/16  C.S. v. Superior Court CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| C.S. et al.,<br><br>        Petitioners,<br><br>v.<br><br>SUPERIOR COURT OF SOLANO COUNTY,<br><br>        Respondent;<br><br>SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT,<br><br>        Real Party in Interest. | A146367<br><br>(Solano County<br>Super. Ct. Nos. J41919; J41920;<br>J41921; J42036; J42475) |

C.S. and A.M. (mother and father, respectively; collectively parents), the parents of E.S., age ten, A.S., age four, J.M., age three, A. M. age two, and T.M., age one, by separate petitions, seek to set aside the juvenile court's order terminating reunification services and setting a permanent plan hearing pursuant to Welfare and Institutions Code,[1] section 366.26.  Mother contends that her reunification services were inadequate because the Solano County Department of Health and Social Services (the Department) did not refer her for a psychiatric evaluation.  Father argues that there is insufficient evidence to support the court's finding that return of the children to him would cause a substantial

---

[1] All further statutory references are to the Welfare and Institutions Code.

risk of detriment, and that reasonable reunification services were not provided.  We grant mother's petition, but determine that father is not entitled to any extraordinary relief.

## I.  FACTUAL BACKGROUND

We have previously set forth the facts that brought the children to the attention of the Department.  (*C.S. v. Superior Court* (Nov. 14, 2014, A142722) [nonpub. opn.] (*C.S. I*).)  We also recently summarized those facts in *In re T.M.* (Jun. 25, 2015, A143184) [nonpub. opn.] (*T.M.*):[2]

On June 14, 2013, the court sustained jurisdiction in this case based on findings that parents:  (1) failed to protect J.M., who was 13 months old at the time of detention, in that he was found to be malnourished in their home; (2) failed to seek medical attention for J.M. thus placing his siblings at substantial risk of similar harm; and (3) failed to adequately supervise his siblings.  (*Id.* at pp. 2, 4.)

In September 2013, the Department reported that J.M.'s MRI showed that he had suffered a subdural hemorrhage on his brain which was caused by abusive head trauma.  (*C.S. I, supra*, at p. 5.)  The Department also learned that E.S. had reported that A.M., the father of her siblings, had sexually abused her.[3]  Parents denied the allegations.  (*Id.* at p. 5.)  Following the Department's investigation, it concluded that the alleged sexual abuse was substantiated.  (*Ibid.*)

The six-month review hearing was held on January 24, 2014.  The Department reported that parents were actively participating in their case plan and had attended all of their visits.  It recommended that reunification services be continued and it amended parents' case plan to include an objective that they would not permit others to sexually abuse their children.  (*C.S. I, supra*, at p. 10.)  The court extended reunification services for parents.  (*Id.* at p. 6.)

Mother gave birth to T.M. in April 2014.  (*C.S. I, supra*, at p. 6.)  The Department filed a section 300 petition alleging that T.M. was at risk due to parents' failure to meet

---

[2] We quote from our opinion in *T.M.*, *supra*, pp. 2–4.
[3] E.S.'s alleged father is [W.J.-G.]  (*Id.* at p. 1, fn. 1.)

2

the needs of T.M.'s siblings. The court detained T.M. and placed her in the home of her paternal aunt where two of T.M.'s siblings were also residing.

The Department's report for the jurisdictional and dispositional hearing noted that it was concerned that parents did not seek medical attention for J.M. regarding his weight loss and failure to eat, and that parents had used inappropriate physical discipline on J.M.'s siblings. The Department opined that T.M. was at risk of harm because it was not clear whether parents had used available services to adequately address the issues that brought their children before the court. It was also concerned about E.S.'s disclosure that she was sexually abused by father. The Department recommended that T.M. continue in an out-of-home placement and that reunification services be offered to parents.

The contested twelve-month review hearing was held on July 2, 2014. (*C.S. I, supra*, at p. 7.) The Department's social worker testified that parents were now living in Sacramento County to be closer to the children. (*Ibid.*) Parents had consistently attended therapeutic visitation and participated in individual counseling and parent-child interaction therapy. (*Ibid.*) They, however, denied E.S.'s allegations of sexual abuse, although parents had expressed willingness to follow a safety plan to ensure the children were protected from abuse. (*Ibid.*) The social worker opined that mother had substantially complied with addressing the issues that led to removal of the children. (*Ibid.*) Father had also complied with his plan by completing a parenting class, attending visitation and counseling, and incorporating his learning in interacting with the children. (*Id.* at pp. 7–8.) She opined that there was a substantial probability that the children could be returned to parents. (*Id.* at p. 8.) The court questioned her about whether parents had admitted that J.M. was shaken, that he was not properly fed, and that E.S. was sexually abused. The court was concerned about whether mother would report any abuse out of fear that the children might be taken away. It continued the matter for further briefing and argument. (*Ibid.*)

On August 7, 2014, the court terminated reunification services for parents in the case of T.M.'s siblings. (*C.S. I, supra*, at p. 8.) It found that parents had not addressed the physical abuse to J.M. or E.S.'s sexual abuse in therapy and therefore it could not find

3

that parents had resolved the problems that led to the dependency. (*Ibid.*) As to T.M., the social worker testified that as with the older children, T.M. was at substantial risk, and was more vulnerable than her older siblings. The Department recommended that the court bypass services in T.M.'s case under section 361.5, subdivision (b)(10), because reunification services were terminated as to T.M.'s older siblings. (*C.S. I*, at p. 8.) The court sustained the section 300 petition as to T.M. and bypassed reunification services. (*Ibid.*) It set a section 366.26 hearing for T.M. on the same date as her siblings.

Parents petitioned for extraordinary writ review seeking to set aside the court's order setting a section 366.26 hearing. (*C.S. I, supra*, at p. 1.) On November 14, 2014, this court granted the parents' petitions, vacating the juvenile court's orders of August 7, 2014 terminating parents' reunification services and bypassing reunifications services as to T.M. (*Id.* at p. 12.) We opined that parents had not received reasonable reunification services because they were led to believe that they had completed the requirements for reunification and were never informed that they were required to address and acknowledge J.M.'s head trauma and E.S.'s sexual abuse in therapy before the 12-month review hearing. (*Ibid.*) We also ordered the court to vacate the setting of the section 366.26 hearing and to issue new orders extending reunification services for parents. (*Id.* at pp. 12–13.) [We end our quotation from *T.M.*]

On December 4, 2014, upon remand, the juvenile court reinstated reunification services for parents, specifically requiring parents to undergo psychological evaluations. The court also ordered the Department to develop a case plan and ordered parents to comply with it. Dr. Antonio Ramirez conducted psychological evaluations of parents on December 16, 2014. Ramirez diagnosed mother as having narcissistic personality features, depression, and borderline intellectual functioning. He opined that mother would benefit from therapy focused on building empathy and attunement for her children and taking responsibility for her behavior. He also believed that she would benefit from therapy to address domestic violence. He recommended that accommodations for both cultural and cognitive differences should be considered within the therapeutic framework. Ramirez further opined that mother showed motivation and willingness to succeed in

4

reunification efforts but that the likelihood of her success was rather low. He recommended that she be referred for a psychiatric evaluation to determine if she needed medication for symptoms of depression.

Ramirez conducted the evaluation of father in Spanish. He opined that father's probability of success at reunification was fair. Ramirez stated that father had deficits in both empathy and limited intellectual functioning which caused concern about his potential to empathize and nurture his children and to implement the skills necessary for reunification. Father denied sexually abusing E.S. and denied any domestic violence. Ramirez opined that father would benefit from individual therapy with a focus on developing empathy and insight about his role as a parent and partner. Ramirez also recommended that father participate in a program for men who batter and that he take parenting classes. Ramirez concluded that father required that services be delivered in a culturally appropriate format.

The Department's case plan for parents required that they participate in individual counseling to accept E.S.'s disclosure of sexual abuse by father and address how the sexual abuse impacts E.S. and the family. The Department also required that parents: (1) articulate how they will parent differently in light of E.S.'s disclosure; (2) create a written protection plan to address behavioral steps they will take to ensure E.S.'s security; (3) discuss the petition's allegations of sexual abuse, neglect, malnourishment, and physical abuse in therapy; and (4) participate in parenting classes to address stress, coping skills, and empathy for the children. The plan further required mother, in consultation with her therapist, to consider Dr. Ramirez's recommendation that she be evaluated for medication.

An interim review hearing was held on January 29, 2015. The Department reported that parents regularly visited with the children. Mother was in therapy with Krissie Coronilla, an intern who was under the supervision of a licensed therapist. Mother had attended three sessions, two in November 2014 and one in December 2014. The sessions focused on coping skills and implementing skills learned in parenting classes. Coronilla reported that mother presented as inauthentic and rehearsed when

5

discussing her case and her parenting skills. The Department instructed mother to resume her therapy sessions and agreed to assume the cost so that mother could attend therapy weekly. Mother's case plan also required her to demonstrate her capacity to protect E.S. by assuring that father was compliant with his case plan in addressing the issues that brought the children before the dependency court. Mother had attended nine parenting classes and had missed four classes.

Father had begun individual therapy with Coronilla, but the Department requested that he see a Spanish-speaking therapist. On January 15, 2015, the Department referred him to Silvia Dominguez-Rios, a licensed marriage and family therapist. He had attended 17 parenting classes and had missed two classes.

A status review hearing was set for March 20, 2015 to discuss the case plan and parents' psychological evaluations. The matter was apparently continued to June 4, 2015. The court's minutes for March 26, 2015 indicate that the court ordered the Department to address issues regarding mother's therapy.

The Department's June 1, 2015 report for the 24-month review hearing recommended that the court terminate reunification services for parents. The Department reported that mother had confirmed that she was pregnant and due to deliver in August 2015. In February 2015, mother had not disclosed her pregnancy to her social worker even though she appeared to be pregnant. Parents continued to reside together in an apartment in Sacramento where they had lived since December 2014. Parents continued to be on probation on the related criminal case involving their treatment of J.M. and would continue to be subject to probation conditions until August 7, 2017. They had designated a support network to assist them when the children are returned to their care, but did not have the telephone numbers for their support people. The children were healthy and continued in an out-of-home placement with their paternal aunt and uncle.

Mother had not yet accepted that E.S. was sexually abused. Veronica Ceja, the Department's social worker, advised her to address the issue in therapy and possibly coordinate with E.S.'s therapist to help both E.S. and mother work through the issue. In April 2015, the social worker contacted mother's therapist to inquire whether mother was

6

receiving culturally sensitive services. Mother's therapist assured the social worker that mother had not communicated any problems with the provision of culturally therapeutic services and that she maintained an awareness of being culturally sensitive in her therapeutic practice. She also met with mother, who expressed no concerns with her therapist's provision of services and said that her therapist was sensitive to her culture. Mother had difficulty making up missed sessions as she was only available on Mondays for appointments. Ceja told mother to work with her therapist to follow up on the recommendation that she consider treatment with medication. The therapist had not provided an update on this issue.

Mother was discharged from her parenting class in April 2015 because she refused to participate in class in an honest manner. She consistently lied about being pregnant, and refused to acknowledge her pregnancy. She had attended only 11 classes since her first session in September 2014 and had not made up any of her missed classes or provided documentation for her excuses. Mother enrolled in a new parenting class in late April 2015. Mother continued to participate regularly in visitation with the children.

Father was progressing in counseling with his therapist. He was actively participating and open to feedback. He was more aware of the issues which led to the dependency of his children and was taking more responsibility. He accepted that E.S. had disclosed sexual abuse, but he continued to deny that he committed the abuse. Father had attended 25 parenting classes and had missed only two classes. He, however, had made only minimal progress in the program because he participated only minimally in the group discussions. He also had not accepted accountability for his actions and felt "victimized by the system." Father, too, had been disingenuous when asked about mother's pregnancy, pretending not to know she was pregnant. Father regularly participated in visitation with the children.

The Department concluded that parents had made minimal progress toward alleviating and mitigating the causes that necessitated out-of-home placement of the children. They lacked insight and accountability of the circumstances that resulted in the dependency case. Mother failed to participate in her parenting classes in an honest

7

manner. She had made some progress in therapy in recognizing and accepting responsibility for J.M.'s malnourishment and in expressing a desire to learn how to address E.S.'s sexual abuse, though she had yet to discuss the physical and sexual abuse allegations in counseling. The Department noted that father had participated in visitation, therapeutic counseling, and parenting classes, but was concerned about his limited understanding of the Department's involvement and his denial about the reasons that led to the dependency. The Department concluded that parents had not demonstrated their ability or willingness to address the reasons for the dependency or the allegations of physical and sexual abuse. It therefore recommended that reunification services be terminated.

The matter was continued to July 23, 2015 for a contested hearing. Mother testified that the reason for the dependency case was that she did not take J.M. to the hospital on time. She acknowledged that there was a criminal case in which she was charged that involved J.M. She also acknowledged that E.S. had reported that she was sexually abused by father, but she testified that E.S. had never told her about the abuse. She also testified that she did not believe that E.S. was molested but that she was developing a safety plan with her therapist to address the abuse. She admitted that she was discharged from her parenting classes because she did not want to reveal personal information in front of the group. She also admitted that one of the requirements of the class was to discuss why she was involved with Child Protective Services and why she had a criminal case. Mother had since enrolled in another parenting class in April 2015 and had attended fifteen classes.

She denied that she and father had been involved in domestic violence even though she acknowledged that the police were called when she was living with father at his sister's house in Texas. She also denied writing a suicide note.

Mother testified again after the hearing was continued to September 4, 2015. She then claimed that she was uncomfortable with her therapist because the therapist is not bilingual and mother could express herself better in Spanish on some issues. She also complained that her therapist did not write things down and did not appear to take her

8

seriously. She, however, admitted that she understood her therapist and was able to communicate with her. She also conceded that she often spoke to her bilingual social worker in English and that her parenting classes were in English.

Father testified that the dependency case arose because he and mother did not take J.M. to the hospital when they were told to do so. He knew that the court found that J.M. was physically abused but he did not know how that could have happened. He also denied punishing the children by feeding them chili peppers or that he punished J.M. by tying him to a bed. He admitted that he and mother fought in Texas and that the police were called because he mistakenly believed that mother intended to harm herself. He had discussed E.S.'s sexual abuse allegations with his therapist, and they had developed a safety plan where he cannot be alone with E.S. and mother would be responsible for taking the kids to and from school and for bathing them.

Father testified that he was engaged in individual therapy on a weekly basis and attended parenting classes. At the time of the hearing, he had attended over 30 of the required 52 classes. He did not know how J.M. suffered his head injury and he did not know why E.S. would accuse him of sexual abuse.

Ceja, the Department's social worker, testified that she was assigned to parents' case in December 2014. Mother preferred to speak with her in English. Sometime after January 2015, Ceja discussed with mother whether she had any concerns about her therapist because she was not Spanish-speaking. Mother confirmed that she wanted to stay with her therapist.

With regard to parents' participation in parenting classes, Ceja testified that father's participation was not productive because he presented as dishonest in classes. Father had difficulty with explaining why he was in class and presented himself as a victim. He did, however, consistently attend classes and as of April 2015, he was participating more and was learning more about parenting. Ceja further testified that while father had demonstrated grief over J.M.'s malnourishment in therapy, he had not discussed the circumstances that led to the malnourishment or the physical or sexual

9

abuse in therapy. Ceja was concerned that as these issues had not been addressed, there was a potential that they could not be truly corrected and prevented in the future.

Ceja testified that mother's participation in parenting classes was disruptive to the class and she was not honest about her pregnancy or why she had a child welfare services case. She subsequently enrolled in a new parenting class where she was asking appropriate questions and interacting well with the other students. Mother continued in therapy and had taken responsibility for J.M.'s malnourishment and acknowledged that E.S. reported sexual abuse, but had not yet discussed the sexual and physical abuse allegations in therapy. Ceja reported that mother had not yet been evaluated for medication but that mother had agreed to consider the issue in therapy. Mother assured Ceja that she was satisfied with Coronilla, and did not need a bilingual therapist.

In July or August 2015, after the contested hearing had begun, mother requested to change to a Spanish-speaking therapist. Mother also told Ceja that she needed to change therapists for scheduling purposes as Coronilla would no longer be available on Mondays.[4]

Ceja recommended that the children remain in out of home placement because parents had not addressed the issues that led to the dependency of their children. She was also concerned about mother's lack of honesty with her providers and her ability to care for the children on her own as she would be the primary caretaker.

Ceja also testified that E.S. left to visit her father, W.J.-G., in Texas in June 2015 and had not returned to California, that a home study had been completed, and that the Department requested that E.S. be placed with her father with the provision of family reunification services.

Claudia Dias, a counselor and attorney, testified that she operated a program that included batterers treatment, child abuse treatment intervention, parenting classes, and family violence prevention. The Solano County Probation Department referred parents to her program. Father had participated in 44 classes but only answered direct questions in

---

[4] Mother gave birth to a daughter in August 2015; a dependency case for that child is pending in Sacramento.

group sessions and was not accountable for the actions that brought him into the program. Father was in denial of the issues that resulted in the children's dependency case. Mother attended 11 sessions but was not honest in relating why she was in the program. Mother did not hold herself accountable for why her children were removed from her. Based on her interactions and observations of parents, Dias opined that it was not safe to return the children to their care.

Sylvia Dominguez-Rios, father's therapist, began providing services to father in late January 2015. She testified that it took several sessions to develop a rapport with father and to address the goals of his case plan. Father became more open to understanding and accepting E.S.'s disclosure of sexual abuse and learned to verbalize how sexual abuse might occur and what to do if one of his children disclosed sexual abuse. She also developed a written safety plan with father. Father had worked to develop empathy and had learned to integrate the skills he was learning. He had also acknowledged his fault in not acting immediately to address J.M.'s physical condition. Father had made substantial progress in therapy and had shown a commitment to meeting his treatment plan goals. She opined that he could safely parent his children.

Dominguez-Rios, however, testified that father had not acknowledged that he disciplined the children by giving them chilies or tying them to a bed, but did acknowledge inappropriate hitting. Father believed that J.M's skull fracture occurred in foster care.

Before the children could be returned to parents' care, Dominguez-Rios recommended family therapy and a transition to unsupervised visits. The process could take weeks or perhaps a couple of months.

The trial court found that reasonable services were offered to parents and terminated reunification services, finding by a preponderance of the evidence that return of the children to the custody of parents would create a substantial risk of detriment to their safety and well-being. The court set the matter for a section 366.26 on January 14,

11

2016. As to E.S., the court ordered that she be returned to her father, W.J.-G., in Texas with family reunification services.[5]

## II. DISCUSSION

Parents challenge the juvenile court's order terminating reunification services. Father also challenges the court's finding that it would be detrimental to return custody of the children to him.

The substantial evidence test is the appropriate standard of review. (*In re Henry V.* (2004) 119 Cal.App.4th 522, 529.) " 'In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible.' " (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) " ' The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case. . . . "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ." ' [Citations.]" (*In re K.C.* (2012) 212 Cal.App.4th 323, 329–330.) "When reunification services are ordered, the reunification plan 'must be specifically tailored to fit the circumstances of each family [citation] . . . .' [Citation.]" (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1474.)

---

[5] W.J.-G. and mother did not file a petition in E.S.'s case. Father's notice of intent to file a writ petition includes E.S.'s case number. To the extent father purports to challenge the court's order in E.S.'s case, he lacks standing. (See *In re Jodi B.* (1991) 227 Cal.App.3d 1322, 1328–1329 [step-parent is not a "parent" for purposes of reunification].)

### A.  Mother's petition.

Mother argues that her reunification services were inadequate because she was not referred to a psychiatrist to be evaluated for medication.  We agree.

*In re K.C., supra*, 212 Cal.App.4th 323 is instructive.  There, the court held that the department had not provided reasonable reunification services where it had not obtained a further mental health evaluation for psychotropic medication for a father who suffered from multiple psychological disorders including schizophrenia that interfered with his ability to address the issues that caused his children's removal.  The court noted that "the Department appeared to delegate the burden of finding and obtaining suitable services to [the father]—despite the high likelihood that the very issues necessitating treatment would interfere with his ability to obtain it."  (*Id.* at p. 330.)

Here, too, it is likely that mother's mental health issues interfered with her ability to address the issues causing her children's removal.  Dr. Ramirez, in his psychological evaluation of mother, opined that mother showed signs of depression.  He also noted that mother had attempted suicide in 2012, and might suffer from post traumatic stress disorder from having survived a rape and domestic violence.  "The last two could contribute to a Post-Traumatic Stress Disorder (PTSD) diagnosis and be associated with both depressive and avoidant components of her personality observed in this evaluation.  Another possible diagnosis could be Avoidant Personality Disorder that needs to be ruled out."  He therefore recommended that mother be referred for a psychiatric evaluation for symptoms of depression and the possible need for medication.

The Department, however, did not refer mother for a psychiatric evaluation.  Instead, it delegated the issue to mother and her therapist.  In its case plan for mother dated January 29, 2015, it included the objective that, "[i]n consultation with her individual therapist[, mother] is to consider the psychological evaluation recommendation for a medication evaluation and follow the recommendation if any to take medication if it is prescribed."  Ceja, the Department's social worker, did not provide mother or her therapist with this case plan objective until April 17, 2015 (therapist) and April 23, 2015 (mother).  At the 24-month review hearing on July 24, 2015, Ceja testified that mother

13

and her therapist were still evaluating the issue.[6] She acknowledged that mother had not refused to consider psychiatric treatment or medication. Indeed, the psychological evaluation noted mother's strong motivation and willingness to abide with the requirements for reunification. Yet, the Department never offered to make a psychiatric referral. The Department's failure to provide mother with a psychiatric evaluation was unreasonable. As in *In re K.C.*, "[n]othing in the [Department's] brief explains or justifies the Department's failure to arrange for a medication evaluation for [mother]." (*In re K.C., supra,* 212 Cal.App.4th at p. 332.) Because mother was open to obtaining a medication evaluation, the department was required to make an " 'effort . . . to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success.' " (*Id.* at p. 329.) It did not do so. Accordingly, we must reverse this matter yet again because the Department failed to provide reasonable reunification services. Our conclusion makes it unnecessary to address mother's further contentions including her claim that the court failed to provide her with a culturally sensitive and licensed therapist. On remand, we assume the court will reexamine the individual therapy issues in conjunction with its order requiring the Department to refer mother for a psychiatric evaluation.

### B. Father's petition.

Father contends that the court abused its discretion in finding that there would be a substantial risk of detriment to the children if they were returned to his home. We conclude that the record fully supports the court's finding.

Father's case plan required that he accept E.S.'s disclosure of sexual abuse, validate it, and create a protection plan to address the behavioral steps he would take to ensure E.S.'s safety. Father was also to discuss the allegations of sexual abuse, neglect, malnourishment and physical abuse with his therapist, and address parents' history of

---

[6] The Department delayed in providing mother and her therapist with a modified case plan until mid-April 2015, as it had waited for the court to approve the plan. While it is not clear when the court approved the plan, the court met and conferred with the parties on March 20, 2015 to discuss the case plan and review the psychological evaluations of parents.

14

domestic violence. While father's therapist opined that he had made substantial progress in therapy and had signed a protection plan for his children, father continued to deny that he had any role in the sexual abuse of E.S. He also denied any inappropriate discipline of the children with the exception of hitting the children.

Hence, while father had made much progress in mitigating the causes that necessitated placement, additional work was necessary before the children could safely be returned home. Even Dominguez-Rios, father's therapist, conceded that father was not ready to take immediate custody of the children but would need a transition period including interactive family therapy and unsupervised visitation which could take weeks or months. In addition, Dias, who ran father's parenting program, testified that father was in denial of the issues that resulted in the children's dependency and that it would not be safe to return the children to his care.

"Consistent with the purpose of the dependency scheme, the question whether to return a child to parental custody is dictated by the well-being of the child at the time of the review hearing; if returning the child will create a substantial risk of detriment to his or her physical or emotional well-being (§§ 366.21, subds. (e) & (f), 366.22, subd. (a)), placement must continue . . . ." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 900.) Here, in light of the evidence that the children could not safely be returned home, substantial evidence supports the court's finding that return of the children to father would be detrimental.

Relying on *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1753 (*Blanca P.*), father argues that the court erred in denying return of the children to him based on his failure to admit sexual or physical abuse of the children. In *Blanca P.*, the court reversed a detriment finding based on a finding of child molestation because there was never any evidence admitted at a hearing that the father had molested his three-year-old daughter and new evidence exonerated the father of any child molestation. (*Id.* at pp. 1757–1759.) The court held that collateral estoppel did not bar another 18-month review hearing on the molestation allegations since there was new evidence supporting the father's denial of any molestation. (*Id.* at pp. 1757–1758.) "In cases where child

molestation is alleged and denied, and there is new evidence supporting the denial, to say that a parent is collaterally estopped from contesting the molestation itself at a 12- or 18-month review hearing is to make the 'antecedent' jurisdiction finding virtually dispositive in terminating parental rights . . . ." (*Ibid.*)

Father's reliance on *Blanca P.* is misplaced. Here, there is substantial evidence of detriment apart from the allegation that father sexually abused E.S. Thus, even if father was falsely accused of sexually molesting E.S., the record as a whole demonstrates that it would be detrimental to return the children to his care.

Father also challenges the court's finding that reasonable reunification services were provided.

The record, however, demonstrates that, upon remand of this case, father's case plan adequately addressed the problems that resulted in removal of the children from parents' home. Father was given a psychological evaluation, participated in parenting classes, visitation, and individual therapy. Throughout the dependency, father was hesitant in admitting the circumstances that brought the children before the dependency court. Although he made strides in recognizing and acknowledging that J.M. had been malnourished, he continued to be in denial of the physical abuse inflicted upon J.M. and E.S. and the sexual abuse perpetrated on E.S. While his therapist opined that he could safely parent the children, she conceded that he was not ready for return of the children to his home. It is well settled that "simply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative. The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-home will not have been ameliorated." (*In re Dustin R.* (1977) 54 Cal.App.4th 1131, 1143.)

Here, the record supports the court's finding that reasonable reunification services were offered to father. The Department was not required to offer father additional services. "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not

16

whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) In light of the extensive services offered to father, we cannot conclude that the Department failed to provide reasonable services.

## III. DISPOSITION

Mother's petition is granted. The juvenile court is ordered to vacate its order of September 17, 2015 terminating mother's reunification services and setting a section 366.26 hearing. On remand, the court shall order the Department to provide mother with a psychiatric evaluation and reasonable reunification services that are consistent with her case plan. Our decision is final in this court immediately. (Cal. Rules of Court, rules 8.452(i) & 8.490(b).)

Father's petition is denied.

_____
Rivera, J.

We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.

18